UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JESSE J. VALE,<br><br>    Petitioner,<br><br>  vs.<br><br>CONNIE GIBSON,<br><br>    Respondent. | No. C 14-1588 PJH (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and lodged exhibits with the court. For the reasons set out below, the petition is denied.

## BACKGROUND

On March 3, 2011, a jury found petitioner guilty of carjacking and second degree robbery. Answer at 1. He admitted to having four prior strike convictions, three prior serious felony convictions, and one prior prison term. *Id.* He was sentenced to 42 years to life in prison. *Id.* On September 19, 2013, the California Court of Appeal affirmed the judgment. *People v. Vale*, No. H037358, 2013 WL 5278501 (Cal. Ct. App. Sept. 19, 2013). The California Supreme Court denied review on December 11, 2013. Answer, Ex. 9.

The underlying facts of the crime are not relevant to the sole claim in the petition, however, the California Court of Appeal set forth a brief background:

> On May 21, 2009, Elijah Pipkin reported that he had been the victim of a carjacking and a robbery. Pipkin had given a woman named Sophia a ride to a Gilroy residence. At the residence, defendant got into Pipkin's vehicle and took the keys from the ignition. Defendant punched Pipkin and ordered him out of the car. Pipkin complied. Defendant then asked Pipkin for his

necklace, bracelet, sunglasses, and wallet.  Pipkin gave defendant the necklace, bracelet, sunglasses, and $80 cash from the wallet.  Defendant tossed Pipkin's car keys to a second male, who got into Pipkin's vehicle and drove away with Sophia.  Defendant drove away in another vehicle.

*Vale*, 2013 WL 5278501, at *1.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

2

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

## DISCUSSION

Petitioner's sole ground for federal habeas relief is that the trial court erroneously denied his motion, which stated that the prosecutor improperly used peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), to remove two prospective jurors with Hispanic surnames.

**Legal Standard**

The use of peremptory challenges by either the prosecution or defense to exclude cognizable groups from a jury may violate the Equal Protection Clause. *See Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992). The Supreme Court has held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *See Batson v. Kentucky,* 476 U.S. 79, 89 (1986).[1] *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process:

First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id*. at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195. To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its

---

[1] The California counterpart to *Batson* is *People v. Wheeler*, 22 Cal. 3d 258 (1978).

own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003).  "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis . . .," particularly when the state court declined to do so.  *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013).  Then the court should "reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine." *Id.* at 1225.

In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  *See Hernandez v. New York*, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).  It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility.  *See Rice v. Collins*, 546 U.S. 333, 340-41 (2006); *Lewis*, 321 F.3d at 830.  Because determinations of credibility and demeanor of the prosecutor and jurors lie "'peculiarly within [the] trial judge's province,'" the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous.  *Snyder v. Louisiana*, 552 U.S. 472, 476-82 (2008) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)); *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

**Background**

The California Court of Appeal set forth the relevant background:

> Voir dire of prospective jurors began on February 23, 2011.  The first group of 18 prospective jurors included two male prospective jurors with the surnames Perez and Espinoza.

### 1. Prospective Juror Perez

4

Perez stated that he was a custodian, that he lived with his parents, and that he had siblings in high school and college. He had no children, and he had never served on a jury. He had lived in Morgan Hill for 13 years.

The prosecutor asked Perez where he had gone to high school and where his sister attended school. The prosecutor also asked Perez about his job history. Perez indicated he had been doing custodial work for about five months. The prosecutor asked, "What did you do before that?" Perez responded, "Go to school," referring to his high school. The prosecutor asked, "Did you just finish up there last year?" The record is unclear as to whether Perez responded to the question—the reporter's transcript reflects that his response was "High school," but it appears this was a continuation of his response to the prosecutor's prior question. In response to further questions, Perez testified that after high school, he lived at home and "[t]ried to get a job."

### 2. Prospective Juror Espinoza

Espinoza stated that he worked for an energy office. He lived with his wife, daughter, and son-in-law. He had five grandchildren, had lived in Gilroy for six years, and had never served on a jury.

After the trial court asked the prospective jurors whether they had any relatives or friends who had been accused of committing a violent crime, Espinoza stated that his nephew was "in for murder right now." He explained that his nephew was incarcerated at Corcoran State Prison and that the incident had occurred in Tulare County in 2005. Espinoza indicated he had not communicated with his nephew during or after the prosecution. When asked whether he had any reason to believe the case had been handled inappropriately, Espinoza replied, "Well, I think he's still going to court for it right now, so that's as far as I can answer on that." He did not believe that the incident would affect his ability to be impartial.

The prosecutor's only question to Espinoza was a request that he clarify "the relationship between you and the person who is incarcerated." After Espinoza stated, "That's my nephew," the prosecutor asked him no further questions.

### 3. Peremptory Challenges

The prosecutor used his first peremptory challenge to excuse Perez. Defendant used his first peremptory challenge to excuse another prospective juror with a Hispanic surname. After the prosecutor used his third peremptory challenge to excuse Espinoza, there was an unreported bench conference.

At the next break, the trial court asked if trial counsel wanted to put anything on the record. Trial counsel asserted that "a jury of [defendant's] peers is just gone." Trial counsel indicated he was making a *Batson/Wheeler* motion and also challenging the composition of the jury venire as not representative of a fair cross-section of the community. (*See gen., Taylor v. Louisiana* (1975) 419 U.S. 522, 528 ["the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial"].)

The trial court agreed that the prosecution had exercised peremptory challenges against two prospective jurors who "appeared to be of Hispanic background." However, the trial court did not "believe a primary foundational

5

showing was made that the use of the peremptories was in a constitutionally invalid way." It ruled, "Therefore, I'm going to deny the [*Batson/Wheeler*] motion." The trial court stated that the People were not required "to state their reasons for the exercise of the challenges" but invited the prosecutor to "make a record nevertheless."

The prosecutor gave three reasons for exercising a peremptory challenge as to Perez. The prosecutor first referred to Perez's age and work history: "He was a younger juror. He had almost no life experience. He is a custodian who's only worked at that job for five months. He came from Sobrato High School, and he made it sound like he started working as a custodian right after that; but then he went on to explain after further questioning that actually he finished up with high school two years earlier and really hasn't been doing anything except living at home in the meantime presumably looking for a job. I think he said he was looking for a job and apparently found one as a custodian. So to me a younger person like that living at home with his parents who's only . . . had one job after high school, which I don't know if he finished, does not have much life experience to sit on a jury."

The prosecutor's next reason for exercising a peremptory challenge as to Perez concerned his attire: "Another thing I noticed was his attire. This juror was wearing long shorts. Hanging out of the pocket of one of the shorts pockets was a red San Francisco 49ers lanyard, which is the type of lanyard you see being handed out in San Jose by the bail bonds people as a free gift. That's what I associated with that. He had long white tube socks on pulled up to his knees and Nike Cortez sneakers on, which I know to be attire of somebody who is a gang member or gang associate or gang affiliate or at least is dressing in a similar way to that. And I should point out that the red color on the lanyard immediately alerted me to the fact that along with the Nike Cortez sneakers this man who did appear to be Hispanic and had a Hispanic sur name [ sic ] might be gang affiliated."

The prosecutor's third reason for exercising a peremptory challenge as to Perez concerned his manner of responding to the trial court's questions: "His—one of the biggest problems I had with him—I don't know if the Court caught this or counsel caught this—was that this juror never answered out loud unless he was directly asked a question. As to all the group questions he kept his mouth shut. Sometimes he would nod or shake his head. Everyone else at the Court's urging answered out loud. This gentleman did not. In fact, I wrote down that he didn't answer out loud when the Court asked that general question of do you agree to volunteer and so that attorneys can follow up will you volunteer this information, and he didn't answer. Then when asked is there any reason you cannot be fair as a group question he had no response. The man didn't even shake his head or nod his head. No response whatsoever, which I took to be disturbing especially with the need for people to be forthright. He was the one person when I asked the question of all 17 jurors if they would hold me to the standard of beyond a reasonable doubt, no [more] no less, he was the one person who hesitated before acknowledging that he would do that. That caused me concern."

The prosecutor also gave three reasons why he exercised a peremptory challenge as to Espinoza. The first reason concerned his appearance: "He was an older gentleman. He was also Hispanic with a Hispanic sur name [sic]. What I noticed about his appearance was that he had an earring in his left ear. It was a stud earring; that cause[d] me concern because it seemed to

6

be sort of an unconventional look for someone of his age. He had a tattoo in the webbing between his thumb and forefinger in his left hand. It was faded dark-blue ink, and it appeared to be either homemade or something that you would get in prison. It obviously wasn't discussed, and I didn't ask him about it; but he had a tattoo in the webbing of his finger, and to me that's something like a prison tattoo or a gang tattoo. I am not [naïve]. I know that lots of people have tattoos. But this did not look like it was professionally done, and the location of it is similar to gang tattoos I've seen in my work as a prosecutor."

The prosecutor's second reason for exercising a peremptory challenge as to Espinoza concerned his nephew's murder conviction: "The biggest problem with him was that he has [a] relative, a nephew, who has been convicted of murder out of this county and is in Corcoran State Prison for it. Apparently it's on appeal because he said he's still going to court for it, but if the nephew is in prison obviously there was a conviction."

The prosecutor's third reason for exercising a peremptory challenge as to Espinoza involved his reaction to something another prospective juror said during voir dire: "When—he did one other thing that bothered me. Juror Number 18 who the court excused later; she was the female writer who had arthritis problems. She made some comment that she was attempted to be carjacked, and the comment was in fact the defendant looked like one of the guys or, you know, he appeared similar appearance to the people who did this to her. And it didn't come out very artfully. But the one visible reaction I saw of the panel was that [Espinoza], . . . he just shook his head. He put his head down and shook his head; and I took that to mean a sign of disapproval, that he didn't like her response, he didn't like her generalizing cross-racially about another race. And I just couldn't see the two of them working together. It caused me some concern and I wrote it down.

The prosecutor pointed out that he had <u>not</u> exercised a peremptory challenge to a prospective juror with the last name Velasco, who was "a young Hispanic man." He called Velasco "a fine juror" who had "some at least life experience" and who had been "forthcoming with his answers." The prosecutor noted that this prospective juror had been challenged by the defense, and that the defense had also excused a female Hispanic prospective juror who the prosecutor intended to leave on the panel. The prosecutor also pointed out that the panel, at that time, still included two Hispanic prospective jurors.

The trial court asked trial counsel if he wanted to respond. Trial counsel responded to only one of the prosecutor's statements, calling it "preposterous" that Perez would be "classified as a gangster because he wears a Bad Boys key chain." However, trial counsel stated, "I respect the District Attorney for what reasons he has for doing what he did."

Trial counsel then referred to his complaint about the jury venire, arguing "we do not have a proportionate ratio of people." The prosecutor responded, arguing that there was no "legal basis" for that challenge. The trial court stated, "The objection is noted. The objection is overruled."

Jury selection then continued, and the seated jury ultimately contained four female jurors with Hispanic surnames.

*Vale*, 2013 WL 5278501, at *1-4 (footnote omitted).

**Analysis**

The California Court of Appeal set forth the relevant law and denied this claim, finding that the trial court did not err when it determined that petitioner failed to make the requisite prima facie showing for a *Batson/Wheeler* motion:

> After the prosecutor excused prospective jurors Perez and Espinoza, three prospective jurors with Hispanic surnames remained on the panel; two were still on the panel later, when the *Batson/Wheeler* motion was discussed. Further, a significant number of prospective jurors with Hispanic surnames still remained in the jury pool, and the final jury included four jurors with Hispanic surnames. Thus, the prosecutor did not strike """most or all of the members of the identified group from the venire.""" (*Taylor*, *supra*, 48 Cal. 4th at p. 615; *see People v. Blacksher* (2011) 52 Cal. 4th 769, 801 [no prima facie showing where, at the time of the defendant's *Batson/Wheeler* motion, there were still two African–American jurors on the panel and the final jury included six African–American jurors].)
>
> The prosecutor also had not """used a disproportionate number of his peremptories against the group.""" (*Taylor*, *supra*, 48 Cal.4th at p. 615.) At the time defendant raised the *Batson/Wheeler* claim, the prosecutor had only exercised three of his 20 peremptory challenges. As defendant acknowledges, the prosecutor did not continue to exercise peremptory challenges to Hispanic-surnamed prospective jurors at the same two-out-of-three rate: he ultimately used eight of his 16 peremptory challenges against prospective jurors with Hispanic surnames, while the defense used eight of its 20 peremptory challenges against prospective jurors with Hispanic surnames. FN3
>
>> FN3. Two of the prospective jurors excused by the defense had hyphenated surnames and, in each case, only one of the two hyphenated names was Hispanic.
>
> Finally, the prosecutor asked both Perez and Espinoza questions about the issues he was concerned about—that is, he engaged them """in more than desultory voir dire.""" (*Taylor*, *supra*, 48 Cal. 4th at p. 615.) The prosecutor asked a series of questions about Perez's work, school, and family, then challenged Perez primarily because of his lack of "life experience." Although the prosecutor asked Espinoza only one question, it did relate to one of the issues he was concerned about: the fact that one of Espinoza's relatives was serving a prison term.
>
> In addition, the record here """suggests grounds upon which the prosecutor might reasonably have challenged' the jurors in question.""" (*Panah*, *supra*, 35 Cal. 4th at p. 439.) In reviewing the record, we note that defendant did not challenge the prosecutor's physical description of Espinoza or his description of Espinoza's reaction to the other prospective juror's statements on voir dire. Defendant also apparently concurred in the prosecutor's description of Perez's clothing and demeanor; he disputed only the significance of Perez's key chain. We also note that the trial court did not contradict the prosecutor's descriptions of these prospective jurors. The fact that "neither the trial court nor defense counsel below contradicted the prosecutor's account of any of the challenged jurors' demeanor or manner of responding to his questions[ ]

8

suggest[s] the prosecutor's description was accurate." (*People v. Adanandus* (2007) 157 Cal. App. 4th 496, 510.)

Perez was a younger juror with limited life experience, which "is a race-neutral explanation" for a peremptory challenge. (*People v. Perez* (1994) 29 Cal. App.4th 1313, 1328.) The prosecutor could also validly challenge Perez because much of his attire appeared to be similar to what a gang member would wear. (*See Wheeler*, *supra*, 22 Cal.3d at p. 275 [prosecutor may "fear bias" if prospective juror's "clothes or hair length suggest an unconventional life-style"].) Finally, Perez's failure to respond to group questions was a race-neutral reason. (*See Howard*, *supra*, 42 Cal. 4th at p. 1019 ["An advocate may legitimately be concerned about a prospective juror who will not answer questions."]; *People v. Ward* (2005) 36 Cal. 4th 186, 202 (*Ward*) [prospective juror's "body language" and demeanor can support a peremptory challenge].)

As for Espinoza, a family member's involvement in the criminal justice system is a race-neutral explanation, even if the prospective juror avers that he or she can put that experience aside. (*People v. Avila* (2006) 38 Cal. 4th 491, 554–555.) Espinoza's tattoos and jewelry were also legitimate grounds for his challenge. (*See Ward*, *supra*, 36 Cal.4th at p. 202; *Wheeler*, *supra*, 22 Cal. 3d at p. 275.) Likewise, the prosecutor could validly challenge Espinoza after he shook his head disapprovingly during another prospective juror's voir dire. (*See Lenix*, *supra*, 44 Cal. 4th at p. 613 [a prospective juror may be excused based upon facial expressions or gestures]; *Ward*, *supra*, 36 Cal. 4th at p. 203 [a prospective juror may be excused base on the fact that he or she "would not fit in" with the other jurors].)

In sum, on this record, substantial evidence supports the trial court's determination that defendant failed to make the requisite prima facie showing for a *Batson/Wheeler* motion, in that "defendant did not meet his burden of raising an inference of discrimination." (*People v. Bell* (2007) 40 Cal. 4th 582, 600; *see Bonilla*, *supra*, 41 Cal. 4th at p. 341.)

*Vale*, 2013 WL 5278501, at *5-7.

While the trial court did not find that petitioner had made out a prima facie case of discrimination, the prosecutor still provided race-neutral reasons for dismissing these jurors and the trial court found that the reasons were valid. Reporter's Transcript ("RT"), Ex 2, Vol 2. at 40-50. Similarly, the California Court of Appeal found that petitioner had failed to make a prima facie showing of improper discrimination at the first step of the *Batson* analysis, but still noted that the prosecutor's reasons were valid. *Vale*, 2013 WL 5278501, at *6-7. While the trial court and California Court of Appeal only informally reached the third step of the *Batson* analysis, this court will look to the third step and conduct a comparative

9

juror analysis, and as discussed below, it is clear there was no constitutional violation and there were proper race-neutral reasons for excusing these jurors.[2]

The prosecutor first argued that juror Perez's young age and lack of work or life experience were of particular concern. Youth and lack of life experiences are valid race-neutral reasons to strike a juror. *See Sims v. Brown*, 425 F.3d 560, 574–76 (9th Cir. 2005), *amended on other grounds*, 430 F.3d 1220 (9th Cir. 2005); *Mitleider v. Hall*, 391 F.3d 1039, 1049 (9th Cir. 2004); *United States v. You*, 382 F.3d 958, 968 (9th Cir. 2004). A review of the voir dire transcripts supports the prosecutor's argument and the findings of the state courts. Augmented Reporter's Transcript ("ART"), Ex. 3, Vol. 2 at 146-47. This juror's lack of life experiences was also demonstrated by the prosecutor's observations that he did not answer many group questions out loud; rather, he nodded, and certain questions he did not answer or nod.

With respect to juror Espinoza, the prosecutor noted that the juror had a nephew who had been convicted of murder and was in prison and an appeal seemed to be ongoing. That a potential juror has a relative who has been convicted of a crime is a race-neutral reason for striking a juror. *See Mitleider*, 391 F.3d at 1048 (brother's conviction for cocaine possession was a facially neutral reason for challenging juror); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987) ("reasonable" to challenge black juror whose brother was in prison for armed robbery), *overruled on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988). The prosecutor also noted that this juror was older and had what appeared to be a handmade tattoo on the webbing of his thumb and forefinger and an earring which was unconventional for someone of that age. Excusing a juror for his appearance is race-neutral. *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam) (finding race-neutral an explanation that African-American juror was struck because he had long, curly, unkempt hair, a mustache, and beard).

---

[2] Because the California Court of Appeal used the appropriate standard, the opinion is entitled to AEDPA deference. *See Johnson v. Finn*, 665 F.3d 1063, 1068-69 (9th Cir. 2011). Regardless, petitioner would not be entitled to relief under a lesser standard.

10

The state court's failure to find a prima facie case or purposeful discrimination was not an unreasonable application of Supreme Court authority.  Assuming that petitioner has met the first step of the *Batson* analysis, he has failed to show purposeful discrimination at the third step after a review of the totality of the facts and the prosecutor's proffered reasons.  While not dispositive, the state courts noted that the final jury included four people with Hispanic surnames.  When the *Batson* objection was raised at voir dire, the prosecutor had used two of three peremptory challenges against jurors with Hispanic surnames.  By the conclusion of voir dire, the prosecutor had used only eight of sixteen challenges for jurors with Hispanic surnames.  On direct appeal, petitioner acknowledged that the prosecutor did not continue to use peremptory challenges against jurors with Hispanic surnames at the same rate.  *Vale*, 2013 WL 5278501, at *6.  By comparison, petitioner's trial counsel used eight of twenty challenges against people with Hispanic surnames.  *Id.*

Petitioner also argues that the prosecutor's reasons were pretextual because the prosecutor stated that juror Perez's specific type of clothing and colors and that petitioner appeared to be Hispanic suggested that he could be affiliated with a gang.  RT, Ex. 2, Vol. 2. at 45-46.  The prosecutor also noted that Perez had a San Francisco 49ers lanyard, which is the type of lanyard handed out by bail bondsmen as free gifts.  *Id.* at 45.  While the prosecutor's comments were not artfully stated, that the prosecutor thought this juror could be involved with a Hispanic gang does not demonstrate purposeful discrimination, especially looking to the prosecutor's actions with other jurors.  The record demonstrates that while the prosecutor may have been concerned that the juror was involved with a gang, he was not motivated by the juror's Hispanic surname.

A comparative juror analysis supports the finding that the challenges were race-neutral and the prosecutor's reasons were not pretextual.  The prosecutor did not use a challenge for another young man with a Hispanic surname, Enrique Velasco, because, unlike juror Perez, this juror had more life experiences and was more forthcoming with his

answers. ART, Ex. 3, Vol. 2 at 93, 155-58. Velasco also worked as a trainer at an accounts receivable auditing firm. ART, Ex. 3, Vol. 2 at 93.[3]

Petitioner argues that looking to the seated jurors demonstrates that the prosecutor's reason for striking juror Espinoza, that his nephew had been convicted of murder, was pretextual. Juror Number Four had a conviction for driving under the influence. ART, Ex. 3, Vol. 3 at 335. While this juror's race is not known, his surname was not Hispanic. Docket No. 18. However, the conviction was a misdemeanor from 1992, nearly twenty years prior to the trial. *Id*. A misdemeanor for driving under the influence is not similar to a murder conviction. Juror Twelve stated that his brother had problems with drugs over the last twenty years that led to a probation violation. ART, Ex. 3, Vol. 2 at 160. This juror did not have a Hispanic surname, but the facts were not similar to the murder conviction of juror Espinoza's nephew.

Petitioner also argues that Juror Eleven's husband had recently been charged with driving under the influence, yet the prosecutor did not excuse this juror. ART, Ex. 3, Vol. 2 at 159-60. As previously stated, driving under the influence is not comparable to murder, and more importantly Juror Eleven had a Hispanic surname. Docket No. 18. The prosecutor's decision to not use a challenge for this juror supports the argument that his decisions were race-neutral and he was not attempting to remove jurors with Hispanic surnames. The record shows that the prosecutor allowed jurors with Hispanic and non-Hispanic surnames with relatives convicted of minor offenses to serve on the jury. Petitioner has failed to show purposeful discrimination and that the state court opinion was an unreasonable application of Supreme Court authority. For all these reasons, this claim is denied.

**Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability

---

[3] Petitioner's trial counsel used a peremptory challenge to excuse this juror. ART, Vol. 3 at 199. The record does not reflect the type of clothing that this juror was wearing.

12

("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that petitioner's *Batson* claim meets the above standard and accordingly GRANTS the COA.  *See generally Miller-El*, 537 U.S. at 327.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 27, 2015.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.14\Vale1588.hc.wpd